**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HASAN PIKER,<br><br>Plaintiff,<br><br>v.<br><br>JEFFERY SCOTT JENNINGS,<br><br>Defendant. | Case No. 1:26-cv-03770-APM<br><br>**ORAL ARGUMENT REQUESTED** |

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

Pursuant to Federal Rule of Civil Procedure 12(b)(6) and Local Civil Rule 7(a), Defendant Jeffery Scott Jennings, by and through his undersigned counsel, hereby submits this memorandum of points and authorities in support of his motion to dismiss the Complaint for failure to state a claim. Mr. Jennings respectfully requests oral argument on his motion.

## INTRODUCTION

Plaintiff Hasan Piker, an internet personality and *provocateur*, makes his living courting controversy—to put it mildly. Some of his more appalling invective includes saying that "America deserved 9/11,"[1] America is "the absolute worst fucking place on the planet, just a horrific, monstrous, awful, dogshit country that I fucking despise, the absolute fucking worst country,"[2] and "I fuck the Constitution. I—I wipe my ass with the Constitution."[3]

---

[1] https://x.com/CalebJHull/status/1164524195688132608 (last accessed Nov. 10, 2026). The Court may take judicial notice of Mr. Piker's statements in the videos cited in this memorandum. *See, e.g.*, *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013).

[2] https://x.com/kevinnbass/status/2117694899206467820 (last accessed Nov. 10, 2026).

[3] https://x.com/TONYxTWO/status/2087362635230515623 (last accessed Nov. 10, 2026).

Importantly for present purposes, Mr. Piker has also said the following: "Can we go back to a better time when lynchings were happening?"; "[I]t's because I'm racist"; and "I'm a fucking racist person." In August 2026, Mr. Jennings played on his political discussion program a video of Mr. Piker saying these things. Mr. Piker now alleges that the video—which Mr. Jennings did not create, edit, or manipulate and had no reason to doubt based on the source of the video and the totality of what is known about Mr. Piker's general worldview—was defamatory, as was Mr. Jennings's accompanying commentary.

As explained below, the Court should dismiss the Complaint because Mr. Piker does not state a claim for defamation, defamation by implication, or false light. Specifically, he fails to plausibly plead either that Mr. Jennings acted with actual malice, or that the alleged defamatory statements are actionable. Each failure is fatal to his claims and merits dismissal.

## BACKGROUND

On August 6, 2026, a video was posted on a social media account belonging to "Senate Republicans" (@NRSC) depicting Mr. Piker making the following statements: (1) "Yes, dude, it's because I'm racist, that's why. It's because I'm racist, dude."; (2) "Go back to a better time when lynchings were happening? This is what I like as a Black man."; (3) "Why you always doing too much with Black people, leave them alone, I wanna go back to lynching, like I get it but relax. Man, shut the fuck up, OK? God damn."; and (4) "You got me, OK? You got me, 'cuz I'm a racist person." *See* Compl. ¶¶ 61–73.[4]

---

[4] The video is available at https://x.com/NRSC/status/2085489355536191674 (last accessed Nov. 10, 2026) ("NRSC Video"). *See* Compl. ¶ 61 n.3. In this video, Mr. Piker also says (i) "I don't give a fuck what Black people care about. Oh, Black people care about this, Black people care about that. Like, shut the fuck up, that's not how politics works," (ii) "Oh, well, Hasan, how dare you? Like it or not, Black people care about this issue. It's, like, it's such a fucking stupid stance," and (iii) "Any other Black folk want to engage in radical activist language in this fucking chat?

Mr. Piker alleges that these clips were taken from a video on his Twitch social media account. *See id.* ¶ 63. Specifically, on October 29, 2024, Mr. Piker held a live broadcast on Twitch where he played a YouTube debate between Black political commentators, which he paused repeatedly to provide personal annotations. *See id.* ¶¶ 41–42.[5] After one commentator made a reference to "woke DAs," Mr. Piker paused the video and stated as follows:

> He said, we need more Klansmen as DAs, OK. Can we go back to a better time when lynchings were happening? This is what I like as a Black man. Also, there's no real racism in America. My man said woke DAs, dude. What are you saying?

Oct. 2024 Twitch Video at 6:52:18–6:52:42; *see* Compl. ¶¶ 43–44. (Other than "woke DAs," the commentator did not make any of the statements Mr. Piker attributed to him.) About a minute later, Mr. Piker reacted to the following comment from one of the viewers of his broadcast: "why you always doing too much with black people leave them alone. 'I wanna go back to lynching' like I get it but fckn relax." Oct. 2024 Twitch Video at 6:53:35. Mr. Piker read the comment aloud and said "Man, shut the fuck up, OK? God damn." *Id.* at 6:53:35–6:53:44.[6] Then he followed up by saying, "Yes, dude, it's because I'm racist, that's why. It's because I'm fucking racist, dude. You got me, OK? You got me, 'cuz I'm a fucking racist person." *Id.* at 6:53:46–6:53:56.

Mr. Jennings played the NRSC Video on an episode of his political discussion program, *The Scott Jennings Show*, on August 11, 2026. *See* Compl. ¶¶ 78, 80–81.[7] The video was

---

Suck my fucking cock." Mr. Piker notably does not even mention these statements, much less allege that they do not reflect his sincere views.

[5] The video is available at https://www.youtube.com/watch?v=Pdb0eXlrhhk (last accessed Nov. 10, 2026) ("Oct. 2024 Twitch Video"). *See* Compl. ¶ 41 n.1.

[6] Evidently, Mr. Piker then blocked the person who voiced this criticism "from further participation in the chat." Compl. ¶ 53.

[7] This episode of Mr. Jennings's show is available at https://www.youtube.com/live/of_eM6wdnJA?si=MRuECidDm6Uru808 (last accessed Nov. 10, 2026) ("SJS Episode").

superimposed with an attribution to Mr. Piker's Twitch account, @HasanAbi, and a Salem News Channel chyron reading "PIKER: 'LET'S GO BACK TO A BETTER TIME WHEN LYNCHINGS WERE HAPPENING.'" SJS Episode at 9:18–10:00.[8] After noting that Mr. Piker campaigns for Democrats, including then-Senate candidate Abdul El-Sayed, Mr. Jennings stated:

> Every Black voter in this country needs to listen to this. And if you look at these Democratic primaries, Black voters have been voting against the socialists, only to be overruled in many cases by young, privileged, White commies. Might these Black voters find a home in the Republican Party this fall? Well, if Democratic campaigns are adopting the Piker plan of returning our country to lynchings, that just might happen. Do you ever notice, by the way, how violent these people are? You have Jewish Americans say they're feeling constantly threatened by El-Sayed supporters. Now El-Sayed's best friend is out there calling for Black voters to be lynched. Beneath all the smiles and dancing videos, there's nothing but hate and violence in the hearts of these communists.

*Id.* at 10:00–10:57. On the day of the broadcast, Mr. Jennings promoted and re-posted this segment of the episode on X, Facebook, and Instagram. *See* Compl. ¶¶ 105–06, 110 & n.5.

According to Mr. Piker, a privately owned, self-styled fact-checking website, Snopes.com, published a statement critical of Mr. Jennings's broadcast on August 14, 2026, claiming that the NRSC Video lacked context. *See id.* ¶¶ 141–48. On August 31, 2026, Mr. Piker's counsel submitted a retraction demand to Mr. Jennings, *id.* ¶¶ 149–50, and to Salem Media Group, Inc. ("Salem Media").

**LEGAL STANDARD**

A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) provides for dismissal when a complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the "complaint must contain sufficient facts, if accepted as true, that 'state a

[8] As a factual matter, Salem Media is responsible for the chyron. Solely for purposes of this motion, however, Mr. Jennings accepts as true Mr. Piker's allegation that Mr. Jennings created the chyron. Compl. ¶ 81; *see Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

claim to relief that is plausible on its face.'" *Hindu Am. Found. v. Viswanath*, 646 F. Supp. 3d 78, 90 (D.D.C. 2022) (Mehta, J.) (citation omitted). "A claim is 'plausible' if a plaintiff pleads facts which 'allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (citation omitted). Although the Court "must accept the plaintiff's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged,'" the Court should "not accept inferences drawn by plaintiff if those inferences are not supported by the facts set out in the complaint, nor must the [C]ourt accept legal conclusions cast as factual allegations." *Id.* (citations omitted).

## ARGUMENT

The Court should dismiss the complaint for failure to state a claim upon which relief can be granted. All of Mr. Piker's claims fail, first, because he does not plausibly allege actual malice.[9] And second, the statements in the NRSC Video are literally true—there is and can be no dispute that Mr. Piker said what he is on camera saying. The dispute is over whether those statements reflect what he really meant, which is not sufficiently verifiable to be actionable as defamation. On either or both of these independently sufficient grounds, Mr. Piker's claims should be dismissed.

### I. Mr. Piker Does Not Plausibly Plead Actual Malice.

Mr. Piker's claims fail because he does not plausibly allege that Mr. Jennings acted with actual malice in playing and commenting on the NRSC Video on his show.[10] "The actual malice

[9] The actual-malice requirement applies not only to defamation claims, but also to false light claims. *See Tah v. Global Witness Publ'g, Inc.*, 991 F.3d 231, 243 (D.C. Cir. 2021); *Nunes v. WP Co. LLC*, 513 F. Supp. 3d 1, 10 (D.D.C. 2020) (Mehta, J.).

[10] A public figure such as Mr. Piker must plead, and ultimately prove, actual malice to prevail on a defamation claim. *See, e.g.*, *Tavoulareas v. Piro*, 817 F.2d 762, 771 (D.C. Cir. 1987) (en banc). Mr. Piker does not dispute this obligation; on the contrary, his complaint is replete with references to Mr. Jennings's alleged actual malice. *E.g.*, Compl. ¶¶ 100–02, 115, 166–67, 173, 184. The Court

standard is famously 'daunting.'" *Tah*, 991 F.3d at 240 (citation omitted) (affirming dismissal of defamation claims). It requires "'clear and convincing evidence' that the speaker made the statement 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Id.* (citation omitted). "'[A]lthough the concept of reckless disregard cannot be fully encompassed in one infallible definition,' the Supreme Court has 'made clear that the defendant must have made the false publication with a high degree of awareness of probable falsity,' or 'must have entertained serious doubts as to the truth of his publication.'" *Id.* (citation omitted). "The speaker's failure to meet an objective standard of reasonableness is insufficient; rather the speaker must have actually 'harbored subjective doubt.'" *Id.* (citation omitted).

To survive a motion to dismiss, a "complaint must 'adequately allege[ ] facts that support an inference that [the] [d]efendant[ ] published the defamatory statements . . . with actual malice.'" *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 143 (D.D.C. 2017) (citation omitted) (dismissing defamation claim for failure to plead actual malice). Even at the pleading stage, "courts may still peer down the road towards a plaintiff's eventual evidentiary burden to deduce whether he plausibly alleged the types of facts that can, if proven, satisfy that burden." *Couch v. Verizon Commc'ns Inc.*, 105 F.4th 425, 432 (D.C. Cir. 2024) (affirming denial of leave to amend defamation claim for failure to plead actual malice). Thus, Mr. Piker "must allege facts that, if

---

need not decide whether Mr. Piker is a general-purpose public figure or a limited-purpose public figure. *See Tavoulareas*, 817 F.2d at 772. He is, at the very least, the latter because Mr. Jennings's allegedly defamatory statements concern Mr. Piker's own comments during a public broadcast regarding a then-existing public controversy, *i.e.*, the racial dimensions of policing and law enforcement. *See generally Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1296–1300 (D.C. Cir. 1980). As for the former status, Mr. Jennings would point out that Mr. Piker himself alleges that he has a "substantial audience across several platforms" of up to "8.9 million followers and subscribers," and that he has received multiple awards during "his media career" over the last 13 years. Compl. ¶¶ 33–38; *see Tavoulareas*, 817 F.2d at 772 (explaining that general-purpose public figures "have knowingly relinquished their anonymity in return for fame, fortune, or influence").

proven, would show that [Mr. Jennings] either knew the[] statements were false, had high awareness that the statements were probably false, or had serious doubts about the accuracy of the statements." *Id.* "Stated another way, [Mr. Piker] must plead facts that would render plausible that [Mr. Jennings] 'in fact entertained serious doubts as to the truth of [his] publication.'" *Arpaio v. Cottle*, 404 F. Supp. 3d 80, 84 (D.D.C. 2019) (Mehta, J.) (citation omitted) (dismissing defamation claim for failure to plead actual malice). He has not done so.

Mr. Piker alleges the following as bases for inferring Mr. Jennings acted with actual malice: (1) the quote from the chyron, (2) the context of Mr. Piker's statements allegedly omitted in the NRSC Video, (3) the public availability of the original Twitch broadcast footage, and (4) Mr. Jennings's alleged "financial and political incentives" to "attack" Mr. Piker. Compl. ¶¶ 129–31. As a matter of law, the Court cannot infer actual malice from any of these grounds.

a. As mentioned, Mr. Jennings did not create the chyron—Salem Media did. *Supra*, p. 4 n.8. But even accepting *arguendo* that the chyron quote could be attributed to Mr. Jennings, the *de minimis* change from Mr. Piker's actual quote is insufficient to show actual malice. The entirety of the revision is to change the phrase "can we" to "let's." *See* Compl. ¶¶ 84–85.[11] It is black-letter law that "a deliberate alteration of the words uttered by a plaintiff does not equate with knowledge of falsity . . . unless the alteration results in a material change in the meaning conveyed by the statement." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991). Here, the literal meaning of Mr. Piker's statement and the altered quote are the same—asking to do something and saying that it should be done both advocate for the end goal. At most, the chyron amounts to a non-actionable "editorial paraphrase[]." *Couch*, 105 F.4th at 433. And indeed, a

[11] Mr. Piker's indignation about this minimal alteration is particularly ironic in light of the fact that his quotes at issue themselves egregiously mischaracterized the statements of the source he claims to have been commenting on. *See supra*, p. 3.

closer review reveals that Mr. Piker's real gripe is not that "let's" means something fundamentally different than "can we," but rather that he *did not mean what he said*. *See* Compl. ¶ 87 (alleging that the chyron quote differed from his "sarcastic question"). He only reinforces this understanding by complaining, in the same breath, that "Mr. Jennings did not play the original broadcast for his viewers." *Id.* ¶ 85. But an allegation that Mr. Piker did not mean what he said is not equivalent to alleging that the chyron quote worked "a material change in the meaning conveyed by the statement" that he in fact made. *Masson*, 501 U.S. at 517. Accordingly, actual malice may not be inferred from the minimal, non-substantive alteration of Mr. Piker's literal quote in the chyron.

b. The claimed omission of context in the NRSC Video fares no better. This basis for inferring Mr. Jennings' supposed actual malice suffers from an obvious flaw: He is not alleged to have had any hand in creating that video. Even if it could be assumed that omitting footage surrounding certain of Mr. Piker's statements in the NRSC Video materially altered the meaning of those statements, *but see Deripaska*, 282 F. Supp. 3d at 143 (holding that allegation defendant "intentionally omitt[ed] 'crucial background'" "simply is not enough to make out a plausible case of actual malice"), the most that could be argued is that those who were *aware* of not only the omission but also the content of the omitted footage would have knowledge or reckless disregard of the claimed falsity of the resulting video. But the complaint does not allege that Mr. Jennings was one of those people. Indeed, Mr. Piker fails to allege not only "the existence of some smoking-gun evidence that would show [Mr. Jennings] knew those statements were false," but also "specific allegations of why [Mr. Jennings] might have had 'obvious reasons to doubt the accuracy of'" the statements in the NRSC Video. *Couch*, 105 F.4th at 433. The complaint instead offers only speculation—that "Mr. Jennings surely would have never conveyed to his viewers that Mr. Piker made the statements . . . attributed to him without watching the October 2024 Stream"—and

conclusions—that Mr. Jennings "watched the [NRSC] Video and knew for a fact that [it] was false and misleading." Compl. ¶¶ 98–99.[12] But merely "[a]ttaching a conclusory label to [a defendant's] republication of [a] statement does nothing to prove either that [the defendant] knew the falsity of the statement or had reason to doubt [the speaker's] veracity." *Couch*, 105 F.4th at 434; *see BYD Co. Ltd. v. All. for Am. Mfg.*, 554 F. Supp. 3d 1, 9 (D.D.C. 2021) (dismissing claim where plaintiff pled "no nonconclusory facts alleging the [defendant] knew what it was reporting was false or questioned its truth"), *aff'd*, 2022 WL 1463866 (D.C. Cir. May 10, 2022); *Nunes*, 513 F. Supp. 3d at 7 (holding that "the naked assertion that Defendants knew the statements in the Article were false" is not sufficient to plead actual malice).

c. Next, Mr. Piker asserts that the Court may infer actual malice from the public availability of his original Twitch broadcast. As just mentioned, Mr. Piker cannot quite allege that Mr. Jennings *in fact* reviewed that broadcast. *See* Compl. ¶¶ 98–100.[13] This argument therefore reduces to the contention that Mr. Jennings acted with actual malice because it was *possible* for him to review the original broadcast—and thus, presumably, discover the additional footage that Mr. Piker claims would have materially changed the meaning of his statements in the NRSC Video.

---

[12] Somewhat contradictorily, and without any factual support, Mr. Piker also alleges that Mr. Jennings may have "purposefully avoided checking the October 2024 Stream," Compl. ¶ 98, which is addressed below in connection with the public availability of Mr. Piker's Twitch broadcast. *See infra*, pp. 9–10.

[13] This inability is only underscored by the allegation that "if Mr. Jennings made the . . . defamatory statements against Mr. Piker *without* having watched the October 2024 Stream, he was guilty of actual malice in conveying to his viewers the impression that Mr. Jennings was passing on information that Mr. Jennings did, in fact, know—though he did not." Compl. ¶ 100 (emphasis added). This allegation is another example of Mr. Piker's propensity to put words in people's mouths, as Mr. Jennings never claimed to have reviewed the original broadcast. The only support Mr. Piker can muster for the "impression" Mr. Jennings supposedly "convey[ed]," *id.*, is the @HasanAbi Twitch account attribution on the video Mr. Jennings played. *See id.* ¶¶ 82–83. But the notion that this attribution somehow misrepresented the source of Mr. Piker's statements, *see id.*, cannot be squared with his affirmative admission that all of those statements in fact came from his Twitch broadcast. *See id.* ¶¶ 41–54.

*See, e.g.*, *id.* ¶ 98. To plead actual malice, however, "'it is not enough to show that defendant should have known better'—the plaintiff 'must offer evidence that the defendant in fact harbored subjective doubt.'" *Viswanath*, 646 F. Supp. 3d at 98 (citation omitted). Thus, "in the context of a news reporter, . . . the 'failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish [the] reckless disregard' required to prove actual malice." *Id.* (citation omitted); *see Tah*, 991 F.3d at 242 ("[E]ven an 'extreme departure from professional standards' is insufficient to prove actual malice on its own." (citation omitted)).

This principle is fatal to Mr. Piker's argument. In *Viswanath*, this Court applied the rule to hold that the public availability of documents allegedly contradicting the defamatory statements—exactly the substance of what Mr. Piker argues here—did not plausibly make out actual malice. 646 F. Supp. 3d at 98–99. Similarly, the D.C. Circuit has held that the mere ability to access a plaintiff's social media postings casting doubt on the allegedly defamatory statements does not plausibly establish actual malice, either. *See Couch*, 105 F.4th at 433. Simply put, "even where . . . defendants 'act[] on the basis of a biased source and incomplete information,'" that is "not enough to demonstrate that they 'realized that [their] statement was false or that [they] subjectively entertained serious doubts as to the truth of [their] statement.'" *Deripaska*, 282 F. Supp. 3d at 144 (citation omitted).[14]

d. Finally, Mr. Jennings's alleged "financial and political incentives" to make a "highly publicized attack on Mr. Piker," Compl. ¶¶ 129–30, are of no moment, as "caselaw resoundingly rejects the proposition that a motive to disparage someone is evidence of actual

[14] The Snopes.com publication and Mr. Piker's retraction demand do not change the calculus. "A publisher need not accept denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." *Tah*, 991 F.3d at 242 (citation omitted) (cleaned up).

malice." *Nunes*, 513 F. Supp. 3d at 8 (citation omitted); *see Tah*, 991 F.3d at 243 ("[E]vidence of ill will 'is insufficient by itself to support a finding of actual malice.'" (citation omitted)). So even if the Court were to credit Mr. Piker's rank speculation that criticizing him would somehow advance Mr. Jennings's putative prospects of becoming White House Press Secretary, that still would not be enough to plausibly infer that Mr. Jennings acted with actual malice.[15]

* * *

At bottom, Mr. Piker's claims suffer from a fundamental disconnect. He devotes the vast majority of his complaint to alleging that the NRSC Video materially mischaracterizes the thrust of the statements he made on his Twitch account. But it is not enough in this case to plead that the statements, as portrayed in that video, "were factually or objectively incorrect." *Couch*, 105 F.4th at 432. Instead, he must also plausibly allege that *Mr. Jennings* "subjectively knew the[] statements were incorrect, or recklessly published the[] statements while subjectively knowing the likely falsity." *Id.* And on that score, he falls woefully short. The few factual allegations he makes are insufficient to plead actual malice as a matter of law, and his speculation and conclusory assertions cannot fill the gaps. Just because Mr. Jennings "had a different interpretation of the" statements in the NRSC Video does not plausibly establish actual malice. *BYD Co.*, 554 F. Supp. 3d at 9–10 (rejecting "theory of actual malice" that defendant had source material "in [its] possession, obviously read it, and yet . . . published two statements that completely misstated [its] conclusions"). Because Mr. Piker cannot allege Mr. Jennings acted with actual malice, the Court should dismiss the complaint.

---

[15] It is also worth noting, contrary to Mr. Piker's insinuations, that such a career move would entail a *reduction* in Mr. Jennings's compensation, rather than a financial benefit.

## II. The Statements Are Not Actionable as Defamation.

Mr. Piker's claims also fail because none of the statements at issue is actionable as defamation. To start, the NRSC Video contains statements that Mr. Piker actually made, and the "accurate quoting of another's statement cannot defame the speaker's reputation since the speaker is himself responsible for whatever harm the words might cause." *Thomas v. Pearl*, 998 F.2d 447, 452 (7th Cir. 1993). Indeed, "[t]he fact that a statement is true, or in this case accurately quoted, is an absolute defense to a defamation action." *Id.*; *see Smith v. Sch. Dist. of Phila.*, 112 F. Supp. 2d 417, 429 (E.D. Pa. 2000) ("Generally, a plaintiff can not be defamed by the use of his own words."). Playing a recording of Mr. Piker's own words thus is not defamatory as a matter of law.

What remain are Mr. Jennings's comments about the content of the video. And here, the divide is between Mr. Piker's insistence that his statements were sarcastic and Mr. Jennings's implicit interpretation that they accurately reflect Mr. Piker's views. In other words, the allegedly defamatory aspect of Mr. Jennings's statements concerns Mr. Piker's subjective state of mind. This is quintessentially a non-actionable matter of opinion. *See, e.g.*, *Farah*, 736 F.3d at 539–40 (holding that statement in blog post about plaintiffs' motives was non-actionable opinion); *Ollman v. Evans*, 750 F.2d 970, 989 (D.C. Cir. 1984) (en banc) (holding that article's reference to plaintiff's "desire to use the classroom as an instrument for preparing what he calls the 'revolution'" was non-actionable opinion based on defendants' "interpretation of [the plaintiff's] writing"); *Montgomery v. Risen*, 197 F. Supp. 3d 219, 248 (D.D.C. 2016) (holding that assertion about the plaintiff's motivations was "a subjective judgment that is not verifiable"), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017). Indeed, in a case where the plaintiff claimed that the defendants defamed him by classifying as "homophobic taunting" an incident that he and other individuals involved considered "to be a harmless joke," the Eleventh Circuit held that the disputed classification was

"subjective and not readily capable of being proven true or false." *Turner v. Wells*, 879 F.3d 1254, 1270 (11th Cir. 2018). Consequently, the defendants' interpretation was "a nonactionable opinion." *Id.* So too here. Mr. Piker contends that his statements reflected in the NRSC Video were sarcastic. But that does not make Mr. Jennings's contrary interpretation of those statements any less subjective and, thus, a matter of opinion.

The more general test for determining "whether an utterance is fact or opinion" confirms this understanding. *Deripaska*, 282 F. Supp. 3d at 147. That test "requires viewing the 'totality of the circumstances' with four specific factors in mind: '(1) the specific language used; (2) whether the statement is verifiable; (3) the general context of the statement; and (4) the broader context in which the statement appeared.'" *Id.* (citation omitted). This analysis need not "be undertaken in a rigid lock-step fashion"; rather, the Court may begin with whichever factor is "a logical starting point." *Ollman*, 750 F.2d at 980 n.17.

Here, the logical starting point is the second factor. As the cases just cited make clear, there is no "clear method of verif[ying]" whether Mr. Piker meant his statements. *Id.* at 981. Because no one can see into a speaker's mind, any verdict in this case would instead necessarily be "based on speculation." *Id.* Indeed, in all likelihood, "the trier of fact may improperly . . . render a decision based upon approval or disapproval of the contents of the statement, its author, or its subject." *Id.*

The third factor—the context of Mr. Jennings's implication that Mr. Piker meant what he said—buttresses this understanding. Mr. Jennings's commentary was provided in the context of having just shown the NRSC Video. That video does not contain any of the additional footage that Mr. Piker contends calls his sincerity into question; Mr. Jennings was instead reacting to the statements as presented. For one thing, this disclosure of "the basis for h[is] segment" at issue militates in favor of finding Mr. Jennings's accompanying "colorful commentary" to be an

opinion. *Herring Networks, Inc. v. Maddow*, 445 F. Supp. 3d 1042, 1050 (S.D. Cal. 2020) (holding that talk-show host's statement that the plaintiff network "really literally is paid Russian propaganda" to be non-actionable opinion (emphasis omitted)), *aff'd*, 8 F.4th 1148 (9th Cir. 2021). Further, the NRSC Video contains additional statements by Mr. Piker, which he notably does not challenge in this action, that can only be described as extremely dismissive of, if not hostile toward, the Black community and its concerns. *See supra*, pp. 2–3 n.4. He has also advocated for violence against landlords[16] and "destroy[ing] the White race,"[17] and he claims, with all apparent sincerity, that he "would vote for Hamas over Israel every single time."[18] These additional statements only lend further credence to an interpretation that Mr. Piker's comments about lynching and being a racist could accurately reflect his views. And any reflexive disbelief that someone would openly admit to such a view is significantly undercut in Mr. Piker's case, given his warm embrace of such extremist positions as that the terroristic murder of thousands of innocent American civilians was somehow "deserved," *supra*, p. 1 & n.1, and that landlords and property owners should be "kill[ed]" and the "streets soak[ed] in their fucking red capitalist blood[]," *supra*, p. 14 n.16.[19]

The fourth factor looks to "the broader social context" of the alleged defamation, as certain "types of . . . speech by custom or convention signal to readers or listeners that what is being read or heard is likely to be opinion." *Ollman*, 750 F.2d at 983. As relevant here, two such contexts are "editorial[s]," *id.* at 984, and critiques of another's work, *see Moldea v. New York Times Co.*, 22

---

[16] *See* https://www.youtube.com/watch?v=wCWffgB5_-k (last accessed Nov. 10, 2026).

[17] *See* https://x.com/Tectone/status/2085718952563392798 (last accessed Nov. 10, 2026)

[18] *See* https://www.youtube.com/watch?v=jvAN_N2OQJQ at 21:10–22:15 (last accessed Nov. 10, 2026).

[19] Mr. Piker has even appeared to endorse violence against Mr. Jennings himself, insinuating that he "deserves the chair." *See* https://x.com/EYakoby/status/2115526735207031133?s=46 at 0:04–0:14 (last accessed Nov. 10, 2026).

F.3d 310, 315–16 (D.C. Cir. 1994). Mr. Jennings's discussion program/podcast fits neatly into these categories. Courts in fact have held that such shows trading in "hyperbolic language" and "heated controversy" are precisely the sort of context suggesting that the host is expressing opinions rather than purely factual content. *Gardner v. Martino*, 563 F.3d 981, 988 (9th Cir. 2009);[20] *see McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 183–84 (S.D.N.Y. 2020) (holding that host's statements made on *Tucker Carlson Tonight* were not actionable); *Herring Networks*, 445 F. Supp. 3d at 1049–50 (analyzing statement made by Rachel Maddow "on her own talk show news segment where she is invited and encouraged to share her opinions with her viewers"). In such a context, particularly when one is critiquing another's publication, "[t]he proper analysis would make commentary actionable only when the interpretations are *unsupportable by reference to the . . . work*" being critiqued. *Moldea*, 22 F.3d at 315 (citation omitted). Here, there can be no doubt that Mr. Jennings's interpretation is "rationally supportable by reference to the actual [footage] he . . . [wa]s evaluating," *id.*, as it is simply a literal understanding of Mr. Piker's statements in the NRSC Video.

Finally, the first factor—"the common usage or meaning of the allegedly defamatory words"—is somewhat ill-fitted to the facts of this case. *Ollman*, 750 F.2d at 979–80. To be sure, the term *lynching*, which Mr. Piker appears to primarily take issue with, has a definable and well understood meaning.[21] But as already discussed, *Mr. Piker himself* used that term, saying "Can we go back to a better time when lynchings were happening?" The proper focus of the analysis is

[20] *Martino* is particularly apt. There, the Ninth Circuit held that a radio talk-show host's denigration of the plaintiffs was non-actionable opinion because the host's comments were based on a caller's statements. 563 F.3d at 988. There, as here, the host's statements were self-evidently "an interpretation of the facts equally available to [the host] and to the listener." *Id.*

[21] The remainder of Mr. Jennings's commentary about the NRSC Video is the sort of "indefinite" language that courts routinely find not to be actionable. *See Ollman*, 750 F.2d at 980–81.

therefore not on the words Mr. Jennings used, but on the premise implicit in his commentary that Mr. Piker's statements were genuine. That premise, because it is unspoken, necessarily does not admit of the sort of linguistic analysis called for by the first factor.

* * *

The segment of Mr. Jennings's show regarding Mr. Piker is not actionable as defamation. The playing of the NRSC Video simply republished Mr. Piker's own statements, which are not defamatory as a matter of law. And Mr. Jennings's commentary, which accurately summarized the *literal* meaning of those statements, is not actionable because the allegedly defamatory component concerns Mr. Piker's subjective state of mind—a non-verifiable matter of opinion. On this independent ground, therefore, Mr. Piker fails to state a defamation claim.

## CONCLUSION

Mr. Piker's claims fail for two fundamental reasons. First he does not—because he *cannot*—allege that Mr. Jennings acted with actual malice because there is no basis for pleading that Mr. Jennings knew that the statements, as presented in the NRSC Video, were false, or that he entertained serious doubts about their veracity. And second, neither that video nor Mr. Jennings's accompanying commentary are actionable as defamation. Because the Complaint fails to state a plausible claim for relief, the Court should dismiss this action.

Date: November 10, 2026

By: JEFFERY SCOTT JENNINGS

*/s/ Benjamin G. Chew*
Benjamin G. Chew, Esq. (DC Bar # 418577)
Andrew C. Crawford, Esq. (DC Bar # 1032080)
Peter B. Baumhart, Esq. (*pro hac vice* forthcoming)
Nina C. Franco, Esq. (DC Bar # 90022022)
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC 20006
Tel: (202) 747-1900
Fax: (202) 747-1901
bchew@sheppard.com
acrawford@sheppard.com
pbaumhart@sheppard.com
nfranco@sheppard.com

*Attorneys for Defendant*