**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **HASAN PIKER,**<br><br>Plaintiff,<br><br>v.<br><br>**SCOTT JENNINGS,**<br><br>Defendant. | Case No. 1:26-cv-03770-APM |

**<u>FIRST AMENDED COMPLAINT WITH JURY DEMAND</u>**

1. On August 11, 2026, Scott Jennings falsely told a nationwide podcast audience that Hasan Piker was "out there calling for Black voters to be lynched." He falsely told his listeners that Mr. Piker had a "plan of returning our country to lynchings." And then he falsely told his social media followers that Mr. Piker "says the USA should resume lynchings against black people."



2. All of Mr. Jennings' accusations are false. Mr. Piker has never advocated the lynching of Black Americans, or anyone else. He has never called for a return to lynchings. And he has never proposed anything remotely resembling the supposed plan that Mr. Jennings falsely attributed to him.

3. Mr. Jennings did not merely mischaracterize something Mr. Piker said. He took a false, fabricated, and manipulated video of Mr. Piker, added a made-up quotation that Mr. Piker never uttered, and then made accusations that went beyond even what the manipulated footage purported to show. Mr. Jennings presented those accusations as fact, telling his viewers to "[l]isten for yourself" about Mr. Piker, knowing that he was playing a falsified video of Mr. Piker for those viewers, and completely disregarding the truth of Mr. Piker's actual words.

4. The underlying footage came from a broadcast nearly two years earlier on Twitch, an online streaming service owned by Amazon. On October 29, 2024, Mr. Piker was reacting to a debate between two Black political commentators, one liberal and one conservative. When the conservative commentator blamed "woke DAs" for policies supposedly harming Black Americans, Mr. Piker mocked him by sarcastically portraying that comment as nostalgia for an era before the civil rights movement. Laughing, Mr. Piker said:

> He said, "We need more Klansmen, okay? Can we go back to a better time when lynchings were happening? This is what I like as a Black man. Also, there's no real racism in America." My man said, "woke DAs," dude. What are you saying?

5. Mr. Piker was plainly ridiculing the commentator's position. He was not endorsing it. The debate video remained visible behind him. Mr. Piker introduced the remarks with "He said," laughed as he delivered them, and concluded by questioning the commentator's argument. His viewers understood the sarcasm. Some laughed along. Others expressly described his

comments as hyperbole. Still others predicted that someone would eventually remove the context and circulate the resulting footage as though Mr. Piker had been speaking sincerely.

6. That is precisely what happened. In August 2026, a 42-second video began circulating on social media that combined fragments of three separate Twitch broadcasts. The portions taken from Mr. Piker's October 2024 stream had been cropped, shortened, and rearranged. The underlying debate was removed from view. So was the contemporaneous audience commentary.

7. The words "He said," which identified the object of Mr. Piker's ridicule, were omitted. Mr. Piker's laughter and subsequent explanation were also removed.

8. On August 11, 2026, Mr. Jennings broadcast that false video on *The Scott Jennings Show*, misrepresenting the manipulated video as authentic. But Mr. Jennings did not stop at repeating someone else's misleading edit. He added his own caption to the video, presented as a direct quotation from Mr. Piker:

> PIKER: "LET'S GO BACK TO A BETTER TIME WHEN LYNCHINGS WERE HAPPENING"




9. Mr. Piker never said those words. The original broadcast does not contain that statement. Neither does the manipulated video that Mr. Jennings chose to air. Mr. Jennings

converted a sarcastic question, expressly attributed to and directed toward someone else, into a patently false first-person statement that he attributed to Mr. Piker, and then relayed that false statement to his viewers.

10. Mr. Jennings then went even further. After warning Black listeners to pay particular attention, Mr. Jennings accused Mr. Piker of "calling for Black voters to be lynched" and referred to "the Piker plan of returning our country to lynchings." Later that day, Mr. Jennings published the same false accusation on social media, telling his followers that Mr. Piker believed the United States "should resume lynchings against black people."

11. These were not expressions of disagreement with Mr. Piker's politics. Nor were they rhetorical characterizations of an admittedly controversial commentator. They were factual assertions about what Mr. Piker had said and advocated in his work. Each statement was demonstrably false.

12. The distinction matters. Mr. Jennings was free to criticize Mr. Piker, to condemn his political positions, or to argue that his commentary was offensive. Mr. Jennings was also free to play Mr. Piker's actual words, and provide his own commentary on what Mr. Piker actually said. Mr. Jennings was not free to do what he did: knowingly attribute to Mr. Piker statements that Mr. Piker never made, and then present those invented statements as evidence that Mr. Piker had called for the racially motivated murder of Black Americans.

13. Mr. Jennings had reasons to make that accusation notwithstanding its falsity. His radio program and podcast trade in political controversy. The more provocative his commentary, the greater the opportunity to attract and gain listeners, social media engagement, advertising revenue, and professional attention. At the time of these publications, Mr. Jennings was also being publicly discussed as a candidate for White House Press Secretary. Mr. Jennings'

increasingly enthusiastic public support for President Donald Trump provided an additional reason to attack a prominent left-wing commentator whom the President himself had criticized.

14. The accusation was especially calculated to provoke outrage because it invoked one of the most shameful chapters in American history. Mr. Jennings did not merely suggest that Mr. Piker held objectionable political views. He falsely told Black Americans that Mr. Piker advocated for them to be lynched for exercising their right to vote. He used the history of racial terror as the premise for a political attack built on views Mr. Piker never expressed.

15. Within days, *Snopes*, an independent fact-checker, conducted an investigation and confirmed that the video shared by Mr. Jennings had been heavily edited, presented statements without their context, and rearranged portions of the original broadcasts. *Snopes* thus concluded that Mr. Jennings had falsely claimed Mr. Piker supported bringing back lynchings.

16. Mr. Jennings did not correct his lies. Nor did he respond when *Snopes* asked whether he had reviewed the original broadcasts.

17. On August 31, 2026, counsel for Mr. Piker sent Mr. Jennings a written demand identifying the false statements, explaining their falsity, and requesting a retraction. Mr. Jennings' counsel acknowledged receiving the letter and represented that a response would follow. No substantive response came. No correction was issued. No retraction was published.

18. As of the filing of this action, Mr. Jennings' false statements about Mr. Piker remained available to the public through his podcast and social media accounts. But since the filing of this action, and before the filing of this Amended Complaint, Mr. Jennings' podcast episode was removed from his podcast's website and its distribution channels, without notice to Mr. Piker. On social media, Mr. Jennings continues to falsely portray Mr. Piker as a violent racist

who advocates the lynching of Black people. And Mr. Jennings continues to damage Mr. Piker's reputation and his livelihood.

19. The First Amendment protects robust political disagreement, including speech that is harsh, sarcastic, provocative, and offensive. It does not give a publisher license to lie. This action concerns that distinction.

20. Moreover, at a time in our culture when artificial intelligence and sophisticated digital editing are used to create the impression that people have said things they never said, often causing egregious injury, the law of defamation matters now more than ever, as the law's only meaningful remedy against such misinformation. Sophisticated political operatives such as Mr. Jennings must be held accountable for publishing deliberate and defamatory falsehoods. This action seeks to do so.

**PARTIES**

21. Plaintiff Hasan Piker is an individual domiciled in California. He is a professional live streamer and online media personality who hosts a daily broadcast on Twitch addressing news, current events, politics, popular culture, and video games. His Twitch channel, "HasanAbi," has more than 3.1 million followers. Streaming on Twitch is Mr. Piker's primary profession, and Mr. Piker derives revenue from bringing in new viewers and increasing watch time to his Twitch stream.

22. Defendant Scott Jennings is an individual domiciled in Kentucky. He is a conservative political commentator, Republican political operative, and host of *The Scott Jennings Show*, a nationally distributed radio program and podcast. He is also a CNN contributor who regularly works in Washington, D.C.

## JURISDICTION AND VENUE

23. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

24. This Court has personal jurisdiction over Mr. Jennings under D.C. Code § 13-423(a)(1) and (a)(3). The claims arise from Mr. Jennings' business activities in the District of Columbia and defamatory statements that he made, produced, and published while physically present in the District.

25. On August 11, 2026, Mr. Jennings hosted and broadcast the relevant episode of *The Scott Jennings Show* from Washington, D.C. At the beginning of the broadcast, he announced: "It is Tuesday, August the eleventh. I'm Scott Jennings . . . and we come to you live from Washington, D.C."

26. From Washington, D.C., Mr. Jennings assembled, captioned, and broadcast the manipulated video and accompanying accusations concerning Mr. Piker. Those statements were distributed to a nationwide audience, including listeners and viewers in the District. Besides August 11, 2026, Mr. Jennings regularly hosts and broadcasts *The Scott Jennings Show* from the District of Columbia.

27. Mr. Jennings' conduct constituted the transaction of business in the District and included tortious acts committed within the District. His statements were received and viewed in the District and caused reputational and professional injury to Mr. Piker there.

28. In addition to regularly hosting *The Scott Jennings Show* from the District of Columbia, Mr. Jennings works every week from CNN studios in Washington, D.C. Upon information and belief, Mr. Jennings resides on a transient basis in the District of Columbia.

29. Mr. Piker has suffered reputational damage in the District of Columbia as a result of Mr. Jennings' publications. He has also lost business opportunities involving individuals, organizations, and entities located in the District, including actual and prospective viewers of Mr. Piker's Twitch stream who are located in the District.

30. Exercising personal jurisdiction over Mr. Jennings is consistent with due process. He purposefully conducted the relevant broadcasting activities in the District, and the claims arise directly from those activities.

31. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims, including the production and broadcast of the challenged statements, occurred in the District of Columbia.

## FACTUAL ALLEGATIONS

### ***Mr. Piker's Career Depends on the Reputation That Mr. Jennings Attacked.***

32. Hasan Piker was born in New Brunswick, New Jersey, in 1991 and raised in Turkey. He returned to the United States for college, attending the University of Miami before transferring to Rutgers University, where he graduated *cum laude* in 2013.

33. Mr. Piker began his media career in 2013 at *The Young Turks*, a digital news and entertainment network. He initially worked as an intern, later joined its advertising and business operations, and eventually became an on-air host and producer.

34. In 2018, while still employed at *The Young Turks*, Mr. Piker began broadcasting on Twitch. In January 2020, he left the network to pursue live streaming full time.

35. Live streaming on Twitch is Mr. Piker's profession. On most days, he broadcasts for hours at a time, discussing political developments, current events, popular culture, and other

subjects with an audience that regularly numbers in the tens of thousands and sometimes approaches 100,000 concurrent viewers.

36. Unlike traditional television programming, Twitch broadcasts permit viewers to communicate with the host and one another in real time. Those interactions are part of the broadcast itself. Viewers can watch the host, see the material being discussed, and follow a running live commentary from other viewers.

37. Mr. Piker has built a substantial audience across several platforms. His principal Twitch channel has more than 3.1 million followers. His YouTube channel, @HasanAbi, has more than 2 million subscribers; a second YouTube channel, @Hasan, has approximately 258,000 subscribers. His X account, @hasanthehun, has more than 1.7 million followers, and his Instagram account, @hasandpiker, has approximately 1.9 million followers.

38. Collectively, these platforms account for more than 8.9 million followers and subscribers. Mr. Piker's work has received industry recognition, including a Streamy Award in 2020 and The Streamer Awards' Best Just Chatting Streamer award in 2022.

39. Mr. Piker earns his living through views, subscriptions, advertising, sponsorships, and commercial partnerships. His professional success depends on the willingness of viewers to watch his programming and of advertisers, platforms, and business partners to associate with him. With specific respect to Twitch and social media channels, Mr. Piker's income is principally derived from his ability to attract and retain viewers and increase overall watch time to his stream.

40. Mr. Piker's reputation is therefore central to his livelihood. The false accusation that he advocates the murder of Black people is not merely personally offensive. It strikes directly at Mr. Piker's ability to maintain an audience, obtain sponsorships, and pursue professional

opportunities. The false accusation furthermore harms Mr. Piker's ability to attract future audiences to his Twitch stream and other social media channels by growing his fanbase.

***In October 2024, Mr. Piker Ridiculed a Conservative Commentator During a Live Broadcast.***

41. On October 29, 2024, Mr. Piker conducted a Twitch broadcast during which he watched and commented on a YouTube debate between two Black political commentators, one liberal and one conservative (the "October 2024 Stream").[1]

42. Mr. Piker displayed the debate on his screen, with his own webcam feed superimposed in the lower-right corner. The debate occupied most of the screen, while viewers' comments appeared in a separate area. Mr. Piker repeatedly paused the debate to respond to the commentators' arguments and to interact with his audience.




---

[1] HasanAbi VODs, *HasanAbi October 29, 2024 – 1 Week to Election, MSG Rally, Trump Puerto Rico Fallout, Greg Casar*, YouTube (Oct. 29, 2024), https://youtu.be/Pdb0eXlrhhk?t=24719 (at 6:51:59).

43. At approximately 6:52:00 in the archived broadcast,[2] the conservative commentator began criticizing criminal-justice policies, stating:

> . . . let's look at policy. One of the biggest things that are hurting Black Americans today are policies regarding crime. We have all of these woke DAs who are putting forth policy about—

44. Mr. Piker paused the video at approximately 6:52:19. Laughing at the argument, he responded:

> He said, "We need more Klansmen, okay? Can we go back to a better time when lynchings were happening? This is what I like as a Black man. Also, there's no real racism in America." My man said, "woke DAs," dude. What are you saying?

45. The meaning was evident from the exchange. Mr. Piker was mocking the conservative commentator's statement. Mr. Piker obviously was not expressing support for the Ku Klux Klan, lynchings, or racial discrimination.

46. Several features of the broadcast made that meaning unmistakable. Mr. Piker began with "He said," expressly identifying the other commentator as the subject of his remarks. He laughed while speaking. He ended by repeating the commentator's reference to "woke DAs" and asking, "What are you saying?" The debate he was criticizing remained visible on the screen throughout. And Mr. Piker, who is not Black, framed the remarks as, "[t]his is what I like as a Black man," further confirming that he was not speaking for himself or stating his own views.

47. The contemporaneous audience reaction confirmed how the exchange was understood. Viewers responded with comments including "LMAO," "WOKE DAs???????," "dude what," "you didn't tell me this was a comedy," and "DA's ARE TOO WOKE OMG." The

---

[2] The timestamps referenced herein correspond to the October 2024 Stream as archived on YouTube and linked above. Timestamps may differ slightly on other archived recordings of the broadcast.

visible comments did not reflect an understanding that Mr. Piker was advocating lynching because he obviously was not.

48. Mr. Piker then resumed the debate. At approximately 6:52:48, he paused again when the commentator discussed repealing the "three strikes rule." Mr. Piker responded sarcastically, "We need more mass incarcerations."

49. This was the same rhetorical device. Mr. Piker was mocking the commentator's position by exaggerating what he perceived to be its consequences. He obviously was not endorsing mass incarceration.

50. Again, viewers understood the exchange. They criticized the conservative commentator, describing his arguments as "DUMBASSERY" and comparing him to the satirical Black white-supremacist character portrayed by Dave Chappelle.

51. As the debate continued, Mr. Piker began reviewing comments from his own viewers. At approximately 6:53:34, he highlighted a message criticizing the manner in which he had mocked the conservative commentator:

> [W]hy [are] you always doing too much with black people[,] leave them alone. "I wanna go back to lynching[,]" like I get it but fckn [sic] relax.



52. Even this viewer did not suggest that Mr. Piker supported lynching. The criticism concerned his manner of expressing disagreement with Black conservatives. The viewer acknowledged the point of the joke—"like I get it"—but thought Mr. Piker had gone too far in making it.

53. Mr. Piker reacted angrily. He told the viewer, "Man, shut the fuck up, okay? God damn," and blocked the viewer from further participation in the chat.

54. Still frustrated, Mr. Piker responded with another obviously sarcastic statement:

> Yes, dude—it's because I'm racist. That's why. It's because I'm fucking racist, dude. You got me, okay, you got me. Because I'm a fucking racist person.

55. Mr. Piker was not confessing to racism. Plainly, he was ridiculing the false accusation underlying the viewer's criticism. Mr. Piker's tone and the preceding exchange made that clear.

56. Other viewers recognized the sarcasm. They criticized the objecting viewer, calling the person an "idiot" and a "clown ass chatter." Another viewer expressly explained Mr. Piker's remarks: "It's hyperbole."

57. Mr. Piker then paused the debate again to explain the boundaries he observes when criticizing Black conservatives:

> Like there's a line, okay, when talking about or to Black conservatives. I do not cross that line, okay? I might come near that line, but I do not cross that line. So shut the fuck up. I understand the boundaries, okay?

58. The audience again recognized that Mr. Piker's earlier statements had been sarcastic. Viewers wrote "no jokes, goddamn" and "omg its called hyperbole chill tf out."




59. Some viewers also recognized the danger that the prior exchange could be misrepresented if removed from its context. Their contemporaneous comments included "CLIP," "oh someone clip that and send it to cnn," "can't wait for this to get clipped out of context," "CLIPPED AND SHIPPED," and "CNN salivating with that clip."

60. Those predictions proved prescient. The video was later manipulated in the misleading form that some viewers had predicted.

***In August 2026, the Manipulated Video Began Circulating On X.***

61. In the months leading up to the 2026 midterm elections, the National Republican Senatorial Committee ("NRSC") waged a sustained campaign to discredit Mr. Piker and, by extension, the Democratic candidates with whom he associated, including Michigan Senate candidate Dr. Abdul El-Sayed. The NRSC sought to turn Mr. Piker into a political liability by denigrating him and then portraying his association with Democratic candidates as evidence against them. Its hostility toward Mr. Piker was neither subtle nor concealed. And it was well known to professional political commentators like Mr. Jennings, who understood both the

NRSC's partisan objectives and its incentive to portray Mr. Piker in the most damaging possible light. On information and belief, Mr. Jennings knew that the NRSC was not a disinterested source of information about Mr. Piker, but a political adversary actively seeking to discredit him without regard for the truth.

62. As part of its high-profile campaign to disparage Mr. Piker, on August 6, 2026, the NRSC circulated a manipulated version of the video on X with an accompanying post that said, "How does Abdul El-Sayed's campaign surrogate Hasan Piker feel about Black Americans? Watch for yourself."[3]

63. The accompanying video was approximately 42 seconds long and combined portions of three different Twitch broadcasts (the "Manipulated Video"). The relevant portions taken from the October 2024 Stream had been cropped, shortened, and placed out of chronological order.

64. The alterations were material. They removed the debate Mr. Piker had been watching, the audience commentary showing how his statements were understood in context, and portions of his own remarks that established he was commenting sarcastically on someone else's views.

65. At approximately 0:21, the Manipulated Video shows Mr. Piker, wearing black-rimmed glasses and a white sleeveless shirt, saying: "Yes, dude, it's because I'm racist, that's why, it's because I'm racist, dude."

---

[3] Senate Republicans (@NRSC), X (Aug. 6, 2026, 6:13 p.m.), https://x.com/NRSC/status/2085489355536191674 (archived Aug. 30, 2026, https://perma.cc/9JLX-WJUF).

66. The excerpt omits the criticism to which Mr. Piker was sarcastically responding. It also removes Mr. Piker's profanity, the surrounding dialogue, and the comments establishing that Mr. Piker's audience understood his response as sarcasm.



67. At approximately 0:26, the Manipulated Video cuts to Mr. Piker saying: "—go back to a better time when lynchings were happening. This is what I like as a Black man."

68. That excerpt originally preceded the supposed admission of racism shown moments earlier. The Manipulated Video reverses their sequence.

69. More importantly, the Manipulated Video's excerpt omits the words "He said," which introduced Mr. Piker's caricature of the conservative commentator's argument. It also omits Mr. Piker's laughter and the concluding remarks: "My man said, 'woke DAs,' dude. What are you saying?"

70. The omissions materially transform and change the meaning of Mr. Piker's words. In the original broadcast, Mr. Piker was mocking another person's argument. In the Manipulated Video, his words are presented without their object, falsely making them appear to express his own views.

71. At approximately 0:31, the Manipulated Video shows Mr. Piker saying, "Why are you always doing too much with Black people, 'I wanna go back to lynchings,' like I get it but relax," followed by his response: "Man, shut the fuck up, okay? God damn."

72. The video does not show that Mr. Piker was reading a viewer's written comment aloud. By cropping out the chat, it conceals that the first statement was made by someone else.

73. Finally, at approximately 0:39, the Manipulated Video shows Mr. Piker saying, "You got me, okay, you got me—'cause I'm a racist person."

74. Again, the clip omits the surrounding exchange. It presents an obviously sarcastic response to a viewer's criticism as though it were an admission.

75. The combined effect of these edits was to falsely portray Mr. Piker as someone who expressed support for racism and lynching, rather than someone who had used sarcasm to ridicule political arguments he considered objectionable.

76. By linking the manipulated footage to a Democratic Senate candidate, the post sought to use the false portrayal of Mr. Piker's statements for political advantage, including to influence voters, generate attention, and encourage support for Republican candidates.

77. This action concerns the portions of the Manipulated Video drawn from the October 2024 Stream and the defamatory statements Mr. Jennings subsequently made concerning those portions of the Manipulated Video. But nonetheless, Mr. Piker also disputes the characterization of the other two broadcasts contained in the Manipulated Video and maintains that those excerpts were likewise misleadingly edited.

***Mr. Jennings Promoted the Manipulated Video, Added a False Quotation, and Falsely Accused Mr. Piker of Advocating Lynching.***

78. Five days after the Manipulated Video began circulating on X, Mr. Jennings used it on his podcast, *The Scott Jennings Show*. Mr. Jennings' podcast is published by Salem Media.

Mr. Jennings retains editorial discretion and authority to decide the content of his podcast; to the extent Salem Media helps Mr. Jennings develop and publish visual or other content, it does so on his behalf and at his direction.

79. The August 11, 2026, episode of Mr. Jennings' podcast was titled "Radical Left Lunacy, El Sayed Want to Cancel 4th of July." At approximately 6:10, Mr. Jennings began addressing Black Americans directly:

> African Americans out there within the sound of my voice need to listen up, and you must listen carefully.

80. At approximately 6:46, Mr. Jennings instructed his producers to play "Hasan Piker at cut eight."

81. Mr. Jennings' "cut eight" was the same Manipulated Video published on X five days earlier. Mr. Jennings, however, promoted, endorsed, and worsened the Manipulated Video by adding a visual attribution, subtitles, and a prominent, false caption of his own making:

> PIKER: "LET'S GO BACK TO A BETTER TIME WHEN LYNCHINGS WERE HAPPENING"



82. Mr. Jennings added "@HasanAbi" to the top-left of the Manipulated Video, falsely representing to his viewers that they were watching content taken genuinely from Mr. Piker's Twitch stream. But the content was not taken directly from Mr. Piker's Twitch stream.

83. Mr. Jennings knew that he did not obtain the Manipulated Video from Mr. Piker's Twitch stream, as he obtained it from political social media accounts seeking to smear Mr. Piker. But Mr. Jennings added visual attribution to Mr. Piker's Twitch account "@HasanAbi" anyway, lying to his viewers about the Manipulated Video's source.

84. The caption added by Mr. Jennings similarly purported to quote Mr. Piker directly. It did not merely summarize his remarks or identify a subject of discussion. It falsely represented to viewers that Mr. Piker had endorsed lynchings by saying, "Let's go back to a better time when lynchings were happening."

85. He had not. In the original broadcast, Mr. Piker asked a sarcastic question while mocking another commentator: "Can we go back to a better time when lynchings were happening?" Mr. Piker introduced that question with "He said." Mr. Jennings did not play the original broadcast for his viewers. He instead removed the attribution, changed Mr. Piker's question into a declaration, and presented the resulting statement as Mr. Piker's own words.

86. Even the Manipulated Video did not contain the false quotation Mr. Jennings placed on the screen.

87. The distinction was not semantic. The words Mr. Jennings supplied transformed the meaning of Mr. Piker's remarks. A sarcastic question criticizing someone else's argument became a first-person expression of nostalgia and support for lynchings.

88. In falsely representing to his viewers that the Manipulated Video was taken genuinely from the October 2024 Stream, and endorsing the Manipulated Video on his show, Mr. Jennings republished and adopted the Manipulated Video as his own.

89. Mr. Jennings then reinforced the Manipulated Video and its false accusations with his own false commentary. After playing the video, he told his audience:

> Every Black voter in this country needs to listen to this. And if you look at these Democratic primaries, Black voters have been voting against the socialists, only to be overruled in many cases by young, privileged white commies. Might these Black voters find a home in the Republican Party this fall? Well, if Democratic campaigns are adopting the Piker plan of returning our country to lynchings, that just might happen.

90. There was no "Piker plan of returning our country to lynchings." Mr. Piker had never proposed or endorsed such a plan. Neither the original broadcast nor the Manipulated Video suggested otherwise. The supposed plan was an invention of Mr. Jennings.

91. Mr. Jennings then continued:

> Did you ever notice, by the way, how violent these people are? You have Jewish Americans saying they're feeling constantly threatened by El-Sayed supporters. Now El-Sayed's best friend is out there calling for Black voters to be lynched. Beneath all the smiles and dancing videos, there's nothing but hate and violence in the hearts of these communists.

92. That accusation was also false. Mr. Piker had never called for Black voters to be lynched. He had never called for anyone to be lynched. And nothing in the October 2024 Stream or Mr. Piker's other statements supports Mr. Jennings' false assertion.

93. Mr. Jennings was not simply expressing an opinion. He was falsely asserting that Mr. Piker had advocated racial violence against Black Americans.




94. The accusation was presented as a factual warning. Mr. Jennings specifically directed Black Americans to listen, purported to show them proof, and then falsely told them that Mr. Piker had said that he wanted Black voters lynched.

95. Mr. Jennings' accusations and further false commentary went substantially beyond the statements contained in even that manipulated footage.

96. Mr. Jennings was not simply commenting on publicly disclosed facts, as the Manipulated Video that Mr. Jennings adopted, and on which he purported to provide commentary, was false in itself. Mr. Jennings was instead commenting on his own lies about Mr. Piker.

97. Mr. Jennings knew the statements he attributed to Mr. Piker were false, and he knew they had not been obtained from Mr. Piker's Twitch stream. At minimum, Mr. Jennings acted with reckless disregard for their falsity. He authored a purported quotation that Mr. Piker had never spoken. He presented an edited compilation as evidence of Mr. Piker's beliefs without

the surrounding material necessary to evaluate it. He falsely represented to his viewers that they were watching content taken genuinely from Mr. Piker's Twitch stream. And he attributed to Mr. Piker a supposed political plan and an express call for lynching that appeared nowhere in the source material.

98. Upon information and belief, Mr. Jennings either purposefully avoided checking the October 2024 Stream, or he watched the Manipulated Video and knew for a fact that the Manipulated Video was false and misleading.

99. Mr. Jennings surely would have never conveyed to his viewers that Mr. Piker made the statements Mr. Jennings attributed to him without watching the October 2024 Stream itself, and in deliberately fabricating what he knew to be false, Mr. Jennings acted with knowledge of falsity or reckless disregard for the truth.

100. Alternatively, if Mr. Jennings made the damning defamatory statements against Mr. Piker without having watched the October 2024 Stream, he was guilty of actual malice in conveying to his viewers the impression that Mr. Jennings was passing on information that Mr. Jennings did, in fact, know—though he did not.

101. By adding in Mr. Jennings' own voice the fabricated quotation that appears in Mr. Jennings' podcast but does not appear in *either* the October 2024 Stream or the Manipulated Video, Mr. Jennings himself made a deliberate and material alteration that furthermore constitutes actual malice.

102. In any event, it is axiomatic that a fabricated or altered quotation of the sort Mr. Jennings published constitutes actionable defamation, and defamation published with actual malice, when the fabricated or altered quotation would create a different impression in the minds of average viewers than the actual statements made.

103. The August 11, 2026, episode of *The Scott Jennings Show* was distributed through Salem Media's radio network and was made available nationally through podcast platforms, including Spotify, Apple Podcasts, Audible, and Amazon Music.

104. The episode aired at approximately 1:00 p.m. ET on August 11, 2026. It was then re-aired on Salem News Channel at 11:00 p.m. ET that day and at 5:00 a.m. ET the next day, consistent with Salem News Channel's broadcasting schedule.

***Mr. Jennings Repeated the Accusations on Social Media.***

105. Mr. Jennings did not confine his statements to the August 11 broadcast. That evening, he published a clip of the segment on his X account, @ScottJenningsKY.[4]

106. The accompanying post stated:

> Abdul El-Sayed's best pal and campaign partner says the USA should resume lynchings against black people. Listen for yourself and understand what the socialists have in store for the black community[.]

107. Once again, the accusation was false. Mr. Piker had never said that the United States should resume lynchings against Black people.

108. Nor had Mr. Piker suggested that lynchings were something he or other left-wing commentators had "in store for the black community." That false allegation, like the supposed "Piker plan," was supplied by Mr. Jennings himself.

109. And again, when Mr. Jennings instructed his viewers to "[l]isten for yourself and understand," he did not play them a clip of Mr. Piker's Twitch stream—he played them a clip

---

[4] Scott Jennings (@ScottJenningsKY), X (Aug. 11, 2026, 8:55 p.m.), https://x.com/ScottJenningsKY/status/2087342051503300787 (archived Aug. 30, 2026, https://perma.cc/C8NP-EN8D).

from his own show, containing the false Manipulated Video, Mr. Jennings' invented quotation, and Mr. Jennings' subsequent lies about Mr. Piker.

110. Mr. Jennings published substantially the same material on Instagram and Facebook, exposing additional audiences to the false accusations.[5]

111. As of the filing of this Amended Complaint, the relevant social media posts remained online, and had received substantial public attention. Mr. Jennings' X post had approximately 3.3 million views, while the corresponding Instagram and Facebook posts had approximately 250,000 views.

112. Mr. Jennings' posts to social media were shared and otherwise republished tens of thousands of times. These republications were reasonably foreseeable, as Mr. Jennings' X posts are frequently reposted and shared hundreds or thousands of times.

113. The accusations spread through platforms on which Mr. Jennings had cultivated a substantial political audience. They also reached viewers and listeners who had never seen Mr. Piker's original broadcast and therefore had no reason to know that the footage had been manipulated.

114. Mr. Jennings' publications conveyed a consistent false and defamatory message: that Mr. Piker was a violent racist who expressed support for the lynching of Black Americans and wanted racial violence restored as a feature of American political life.

115. That portrayal was false, and Mr. Jennings knew it was false or recklessly disregarded its falsity.

---

[5] Scott Jennings, Facebook (Aug. 11, 2026), https://www.facebook.com/reel/1036472539349732 (archived Oct. 12, 2026, https://perma.cc/9NZG-S7K2); Scott Jennings (@ScottJenningsKY), Instagram (Aug. 11, 2026), https://www.instagram.com/reel/Db67PsWjj7s/ (archived Oct. 12, 2026, https://perma.cc/D34P-R8QR).

***Mr. Jennings Published the False Statements with Actual Malice.***

116. As detailed above, Mr. Jennings lied about Mr. Piker with actual knowledge of the falsity of his statements, or at least, with reckless disregard for the truth, as evidenced by the material aired on Mr. Jennings' podcast.

117. Numerous aspects of the Manipulated Video itself alerted Mr. Jennings that Mr. Piker was speaking sarcastically and not expressing support for lynching Black people.

118. ***First***, Mr. Piker, who is not Black, framed his remarks as, "[t]his is what I like as a Black man," making clear that Mr. Piker was not speaking for himself or stating his own views.

119. ***Second***, the Manipulated Video shows that Mr. Piker has displayed a poster of Barack Obama sitting directly behind him on stream, which is plainly incompatible with stating support for lynching Black people.

120. ***Third***, yet another reason to doubt that Mr. Piker had expressed support for lynching Black people is the obvious bias of the NRSC. The NRSC had undertaken a protracted campaign to besmirch Mr. Piker in the eyes of the public. Mr. Jennings, who closely follows political developments and commentary, knew that the NRSC was motivated by something other than the truth when it created the Manipulated Video. Namely, the NRSC was motivated by partisanship and increasing Republicans' chances at electoral success in the 2026 midterms.

121. ***Fourth,*** Mr. Jennings or his agents added the @HasanAbi handle to the Manipulated Video, falsely conveying to viewers that it came directly from Mr. Piker and intentionally concealing the fact that it had been stitched together by a political organization intent on disparaging Mr. Piker however possible.

122. But there exists additional contextual evidence of actual malice beyond the broadcast itself.

123. This was not an innocent mistake. Mr. Jennings knew that Mr. Piker had never advocated for the lynching of Black people. Mr. Jennings is a professional political commentator whose livelihood depends on following political figures, understanding their positions, and commenting on their public statements. Mr. Piker was no stranger to him. For months before the publication at issue, Mr. Jennings had followed Mr. Piker's political activities and publicly commented on his growing influence within the Democratic Party. In 2026 alone, Mr. Jennings mentioned Mr. Piker on his podcast or on CNN at least 85 times.

124. In April 2026, for example, Mr. Jennings acknowledged on CNN that he had been tracking Mr. Piker's appearances on behalf of Democratic candidates. Just the month before, Mr. Piker had campaigned for several Black candidates for public office, including Summer Lee and Donavan McKinney. Mr. Jennings was thus paying attention to Mr. Piker at precisely the time Mr. Piker was publicly working to elect Black candidates to Congress.

125. On information and belief, Mr. Jennings knew about those activities. He knew, in other words, that the man he accused of advocating for the lynching of Black people had been actively campaigning to put Black people in positions of political power. That knowledge was fundamentally incompatible with the accusation Mr. Jennings chose to broadcast.

126. Nor was that the only reason Mr. Jennings knew his accusation was false. On information and belief, Mr. Jennings was also aware that Mr. Piker had been suspended from TikTok after defending the phrase "Black Lives Matter." Mr. Piker had publicly defended the very movement whose adherents Mr. Jennings would later have his audience believe Mr. Piker wanted lynched.

127. Mr. Jennings also knew that a substantial portion of Mr. Piker's audience is comprised of Black Americans.

128. Mr. Jennings knew that Black voters were indispensable to the Democratic Party's electoral success. He also knew that Mr. Piker had been campaigning for Democratic candidates, including Black candidates, seeking federal office. Indeed, Mr. Jennings had publicly acknowledged following those very activities.

129. On information and belief, Mr. Jennings therefore knew that his accusation was false. He did not actually believe that Mr. Piker—a prominent leftist who was actively working to elect Black candidates to Congress—had publicly advocated for lynching Black people. The accusation was irreconcilable with what Mr. Jennings already knew about Mr. Piker, his political commitments, and his public activities. Mr. Jennings nevertheless presented it as fact, not because he believed it to be true, but despite his knowledge that it was false or, at minimum, his serious doubts about its truth.

130. And Mr. Jennings understands how to check facts, evaluate context, and recognize deceptive video editing. In the past 12 months, Mr. Jennings has defended conservatives such as President Trump and Charlie Kirk no fewer than 25 times by claiming that their words were taken out of context by critics, or by emphasizing the importance of viewing their words in full context. Along similar lines, in a February 10, 2026, podcast episode, Mr. Jennings claimed that Democrats' "entire political strategy depends on unverified accusations, selectively edited clips, and instant outrage before the facts come out[.]"[6] Mr. Jennings' professed acumen in this area provides further evidence that he knew the Manipulated Video was false or purposefully avoided discovering that fact.

[6] The Scott Jennings Show, *Andy Beshear is a Fraud, There Are No Moderate Democrats* (Feb. 10, 2026), last accessed Nov. 24, 2026, https://omny.fm/shows/the-scott-jennings-podcast/andy-beshear-is-a-fraud-there-are-no-moderate-democrats.

131. Mr. Jennings, moreover, had substantial incentives to smear Mr. Piker. His livelihood depends in substantial part on attracting and retaining an audience for his commentary, generating engagement on social media, and maintaining his standing within conservative political circles.

132. The promotional materials for *The Scott Jennings Show* describe his work in terms of "crush[ing] liberal narratives."[7] Controversial attacks on prominent political opponents are a central feature of the program's appeal.

133. Audience engagement has financial value. Increased listenership and social media attention can generate advertising revenue, syndication fees, licensing opportunities, sponsorships, and other commercial benefits.

134. Mr. Jennings therefore had a financial incentive to publish provocative accusations against a prominent left-wing commentator with millions of followers.

135. Mr. Jennings also had a professional and political incentive. In the weeks surrounding the publications, Mr. Jennings was publicly reported to be under consideration for the position of White House Press Secretary.[8]

136. Ultimately, he was not selected, but as of the time of filing this Amended Complaint, the position has become vacant again. Upon information and belief, Mr. Jennings is again in consideration for the position of White House Press Secretary.

---

[7] *The Scott Jennings Show*, Salem Radio Network, https://srnonline.com/show/the-scott-jennings-show (last visited Oct. 12, 2026) (archived Oct. 12, 2026, https://perma.cc/P84V-X2G2).

[8] *E.g.*, Jeremy Barr, *A Conservative Strategist Called for 'Getting Rid of Trump' Three Years Ago. Could He Be His Next Press Secretary?*, The Guardian (Aug. 28, 2026), https://www.theguardian.com/media/2026/aug/28/scott-jennings-new-trump-press-secretary.

137. Mr. Jennings' relationship with President Trump has evolved considerably over the last decade. In 2016, Mr. Jennings described Mr. Trump in the *Louisville Courier-Journal* as "a vulgar, crude, braggadocious, desperate-to-impress playboy."[9]

138. On January 6, 2021, Mr. Jennings wrote that "President Donald Trump caused this insurrection with his lies and conspiracy theories."[10] He later called for a Republican primary challenger to Mr. Trump in the 2024 presidential election.

139. By 2025, however, Mr. Jennings had become a prominent and staunch defender of the President on CNN and elsewhere.

140. At a Michigan rally in April 2025, President Trump invited Mr. Jennings onto the stage, introducing him as a commentator who defended him regularly on CNN and "defends me really well."[11]

141. Mr. Jennings responded with a joke about his political opponents:

> We were flying in here today, and I said, "Look at these farms. I gotta get a farm in Michigan, because when you own as many libs as I do, you got to get a place to put them all."

---

[9] Scott Jennings, *A Numbed Nation*, Louisville Courier-Journal (Oct. 10, 2016), https://www.courier-journal.com/story/opinion/contributors/2016/10/10/scott-jennings-numbed-nation/91850388.

[10] Scott Jennings, *Trump Caused This Insurrection and Every Republican Must Condemn It*, ScottJenningsKY.com (Jan. 6, 2021), https://www.scottjenningsky.com/comments/trump-caused-this-insurrection-and-every-republican-must-condemn-it.

[11] Julia Ornedo, *CNN MAGA Star Scott Jennings Makes Big Boast on Stage in Front of Trump*, Yahoo News (Apr. 29, 2025), https://www.yahoo.com/news/cnn-maga-star-scott-jennings-035725366.html.

142. The President laughed, and the crowd cheered. Mr. Jennings later shared the exchange on X, where the video received more than 1.4 million views.[12]




143. By August 2026, Mr. Jennings was being discussed as a potential member of the President's communications team. President Trump had also publicly criticized Mr. Piker, including by referring to him as a "communist," a characterization Mr. Jennings likewise used.

144. Upon information and belief, Mr. Jennings understood that a highly publicized attack on Mr. Piker could enhance his standing among the President's supporters and other influential Republican figures, particularly during a midterm election campaign.

145. Mr. Jennings' political and professional incentives were equally powerful. As an experienced political commentator, Mr. Jennings understood that Republicans had made gains among Black voters in the 2024 presidential election, but that those gains were neither assured

[12] Scott Jennings (@ScottJenningsKY), X (Apr. 29, 2025, 7:16 p.m.), https://x.com/ScottJenningsKY/status/1917357399301648703.

nor permanent. He also understood that retaining those voters could prove consequential in the 2026 midterm elections. For example, on an August 6, 2026, podcast episode, Mr. Jennings discussed with a guest that Dr. El-Sayed was weak with Black voters, and again tried to tie Dr. El-Sayed to Mr. Piker.[13]

146. Mr. Jennings therefore had a political incentive to discourage Black voters from returning to the Democratic Party. Falsely portraying Mr. Piker as an advocate for lynching Black people served that objective. It allowed Mr. Jennings to associate Democratic candidates with an accusation of virulent racism, notwithstanding their reliance on Black voters for electoral support. And Mr. Jennings had a personal incentive to advance that narrative: helping Republicans retain those voters and prevail in the midterms would enhance his influence and standing among powerful conservatives, including President Trump.

147. These financial and political incentives help explain why Mr. Jennings chose to amplify the manipulated footage, embellish it with statements of his own, and persist in the accusations after their falsity had been brought to his attention.

148. They also bear on his state of mind when considered alongside the more direct evidence of falsity: the invented quotation, the obvious omissions in the Manipulated Video, the false attribution of the Manipulated Video, the publicly available original footage, and the accusations that had no foundation in either version.

***Mr. Jennings' Statements Damaged Mr. Piker's Reputation and Professional Interests.***

149. Mr. Jennings' publications caused immediate damage to Mr. Piker.

[13] The Scott Jennings Show, *Sec. Doug Collins is Taking Care of America's Heroes* (Aug. 6, 2026), last accessed Nov. 24, 2026, https://omny.fm/shows/the-scott-jennings-podcast/senate-votes-to-hold-fauci-in-contempt.

150. The statements falsely accused Mr. Piker of supporting racially motivated murder. They portrayed him as a person who wanted Black Americans lynched and who regarded the restoration of lynching as a legitimate political objective.

151. Those accusations were particularly damaging given Mr. Piker's profession. His work involves public commentary on political and social issues, and his ability to earn a living depends on the trust and support of viewers, advertisers, sponsors, and commercial partners, and the willingness of those people to watch and engage with Mr. Piker's content online.

152. By falsely portraying Mr. Piker as an advocate of racial violence, Mr. Jennings attacked the reputation on which Mr. Piker's professional relationships depend.

153. The injury was not hypothetical. Responses to Mr. Jennings' social media publications demonstrated that viewers accepted the accusations as true and came to believe that Mr. Piker supported lynching Black people.

154. Mr. Piker has suffered harm to his standing among members of the public, including people who had not previously followed his work and whose impressions of him were formed by Mr. Jennings' false statements. These people resultingly will not engage with or follow Mr. Piker's work in the future, which has negatively impacted Mr. Piker's present and future earning potential.

155. Mr. Piker has also suffered damage to existing and prospective business relationships, including lost professional opportunities involving individuals, organizations, and entities in the District of Columbia.

156. Mr. Piker has experienced public embarrassment, ridicule, emotional distress, and mental anguish as a result of being falsely accused of advocating the lynching of Black Americans, and of Mr. Jennings' widespread publications of that false accusation.

157. Mr. Piker has also incurred financial costs associated with addressing and attempting to mitigate the harm caused by Mr. Jennings' defamatory statements.

158. These injuries to Mr. Piker continue because Mr. Jennings' statements remain publicly accessible and have never been retracted or corrected.

***An Independent Investigation Confirmed That the Video Was Misleading and That Mr. Jennings' Accusations Were False.***

159. On August 14, 2026, *Snopes* published an investigation of the allegations concerning Mr. Piker.

160. Unlike Mr. Jennings' presentation, the investigation examined the original Twitch broadcasts and compared the full recordings with the edited excerpts circulating online.

161. *Snopes* concluded that the video was "heavily edited," that it presented Mr. Piker's remarks "without full context," and that portions appeared "out of order."

162. The investigation also addressed Mr. Jennings' statements specifically. It concluded that Mr. Jennings had "falsely claim[ed] Piker said he was in favor of bringing back lynchings."

163. Those findings confirmed the central distinction Mr. Jennings had intentionally concealed: Mr. Piker's sarcastic ridicule of another commentator's position was not an endorsement of lynching.

164. *Snopes* contacted Mr. Jennings to request comment and ask whether he had reviewed the complete broadcasts. He did not respond before publication.

165. *Snopes* stated that it would update its report if Mr. Jennings provided additional information. As of the filing of this Amended Complaint, no response from Mr. Jennings had been reflected in the published report.

166. Mr. Jennings did not retract his accusations after the investigation was published.

***Mr. Jennings Was Formally Notified of the Falsehoods and Refused to Retract Them.***

167. On August 31, 2026, counsel for Mr. Piker sent Mr. Jennings a written retraction demand.

168. The letter identified the challenged statements, explained why they were false, and demanded that Mr. Jennings correct the record by acknowledging that Mr. Piker had not advocated lynching.

169. The demand supplied Mr. Jennings with an additional opportunity to review the original material and correct his accusations.

170. Approximately two weeks later, counsel for Mr. Jennings acknowledged receipt of the letter and represented that a response would follow.

171. No substantive response was provided. Mr. Jennings did not retract his statements, correct the false quotation, or admit that Mr. Piker had never advocated lynching.

172. At the time of filing this action, Mr. Jennings' statements remained publicly available through his program and his social media accounts.

173. But since the filing of this action, and before the filing of this Amended Complaint, the August 11 podcast episode has been removed from the podcast's website and its distribution channels. Mr. Jennings' social media posts have remained online. Mr. Jennings did not inform Mr. Piker that the podcast episode was being pulled from distribution.

174. Mr. Jennings has therefore continued to disseminate the false accusations even though he knows they were false from the original October 2024 Stream, the independent investigation establishing their falsity, and the detailed notice provided to him by Mr. Piker's counsel.

175. The subsequent after-filing deletion of the podcast episode furthermore shows that Mr. Jennings knew at all times his statements about Mr. Piker were false and defamatory—but he and/or his agents refused to take any action until Mr. Piker sought to defend himself in court.

176. Today, Mr. Piker continues to suffer reputational, professional, and personal harm from those publications.

## CAUSES OF ACTION

### *COUNT ONE — DEFAMATION PER SE*

177. Mr. Piker incorporates the preceding allegations as though fully set forth here.

178. On August 11, 2026, Mr. Jennings published false and defamatory statements concerning Mr. Piker through *The Scott Jennings Show* and through later posts on X, Instagram, and Facebook.

179. The challenged publications include the Manipulated Video, Mr. Jennings' false caption falsely attributing to Mr. Piker the statement "LET'S GO BACK TO A BETTER TIME WHEN LYNCHINGS WERE HAPPENING," his false visual attribution of the Manipulated Video to "@HasanAbi," his false assertion that Democratic campaigns were adopting "the Piker plan of returning our country to lynchings," his false statement that Mr. Piker was "calling for Black voters to be lynched," and his false assertion that Mr. Piker "says the USA should resume lynchings against black people."

180. Each challenged publication concerned Mr. Piker. Mr. Jennings identified him by name, displayed his likeness, placed his Twitch handle on the Manipulated Video, and expressly referred to him in the accompanying commentary. Read in context, Mr. Jennings' references to "Abdul El-Sayed's best pal and campaign partner" likewise unmistakably identified Mr. Piker.

181. Mr. Jennings' statements were false. Mr. Piker has never advocated lynching, called for Black voters or anyone else to be lynched, or proposed restoring lynchings in the United States or anywhere else. He never made the purported first-person statement that Mr. Jennings falsely attributed to him.

182. The defamatory meaning was equally clear. Mr. Jennings falsely portrayed Mr. Piker as a violent racist who supported the lynching of Black people because of their race and political participation.

183. These were false assertions of fact, not merely expressions of political opinion or commentary. Whether Mr. Piker made the statements attributed to him, advocated lynching, or proposed a plan to restore lynchings are matters capable of being proven true or false.

184. Mr. Jennings did not merely offer an interpretation of an authentic recording. He did not play an authentic recording at all. Mr. Jennings instead published materially altered footage that he adopted as his own, represented to his viewers that the footage was authentic, added a purported quotation that Mr. Piker never uttered, and expressly adopted the false meaning of the resulting presentation.

185. The fact that portions of the Manipulated Video were initially assembled or distributed by others does not relieve Mr. Jennings of responsibility for his own publications. He selected the material for his program, added the false caption, added the visual attribution, presented the video as proof of his accusations, and published additional statements that went beyond the footage itself.

186. Mr. Jennings acted with actual malice. He knew his accusations were false or published them with reckless disregard for their falsity and while entertaining serious doubts about their truth.

187. The circumstances supporting actual malice include Mr. Jennings' authorship of a purported quotation that appeared nowhere in the footage; Mr. Jennings' addition of "@HasanAbi" to the video while knowing it was not obtained from Mr. Piker's Twitch stream; the omission of language identifying the true subject of Mr. Piker's remarks; the readily apparent sarcastic nature of the original exchange; the availability of the complete broadcasts; and Mr. Jennings' decision to falsely accuse Mr. Piker of advocating lynching without a factual basis.

188. Mr. Jennings' later conduct provides additional evidence of his state of mind and supports the claim for punitive damages. After an independent investigation identified the falsehoods, and after Mr. Piker's counsel supplied written notice and demanded a correction, Mr. Jennings refused to retract the statements and allowed them to remain publicly available.

189. Mr. Jennings also had financial, professional, and political incentives to publish sensational accusations against Mr. Piker, as alleged above. Those incentives, considered together with the fabrication and selective presentation of the underlying material, further support the inference that Mr. Jennings deliberately or recklessly disregarded the truth.

190. The statements are defamatory *per se* because they directly injure Mr. Piker in his trade and profession. Mr. Piker earns his living as a professional commentator whose business depends on his public reputation and the willingness of viewers, advertisers, sponsors, platforms, and commercial partners to associate with him and engage with his content online. Falsely accusing him of advocating for lynching is incompatible with the proper conduct of that profession and naturally tends to injure him in it.

191. Independently and in the alternative, the statements are defamatory *per se* because they impute conduct involving moral turpitude. By falsely accusing Mr. Piker of calling for the lynching of Black voters, Mr. Jennings portrayed him as advocating lethal racial violence—

conduct so inherently reprehensible that the accusation tends to expose Mr. Piker to public hatred, contempt, and disgrace.

192. As a direct and proximate result of these publications, Mr. Piker has suffered injury to his reputation, damage to his professional relationships, lost business opportunities, public humiliation, emotional distress, and mental anguish.

193. Because the statements were published with actual malice, Mr. Piker is entitled to recover presumed and actual damages. In the alternative, to the extent any statement is determined not to be actionable *per se*, Mr. Piker has suffered actual pecuniary loss, including lost engagements, sponsorships, commercial opportunities, revenue from partnerships and deals that did not materialize, and loss of actual and prospective viewers, followers, and others because of the false and defamatory statements.

194. Mr. Jennings' false and defamatory statements were republished thousands of times, including by Salem News Channel and social media users. These republications were the natural and foreseeable consequence of Mr. Jennings' conduct.

195. Mr. Jennings was familiar with Salem News Channel's broadcast and distribution practices and knew that his social media posts were routinely shared and republished by others. Indeed, widespread republication was an entirely predictable consequence of broadcasting and posting such an inflammatory accusation about a prominent political commentator. Mr. Piker seeks to recover damages arising from these republications and all other reasonably foreseeable republications of Mr. Jennings' defamatory statements.

196. Mr. Jennings' conduct was intentional, malicious, willful, and wanton, and demonstrated conscious disregard for Mr. Piker's rights. Punitive damages are therefore warranted.

### *COUNT TWO — DEFAMATION BY IMPLICATION (IN THE ALTERNATIVE)*

197. Mr. Piker incorporates the preceding allegations as though fully set forth here.

198. This claim is pleaded in the alternative to Count One. Even to the extent particular words or excerpts published by Mr. Jennings are determined to be literally accurate, Mr. Jennings is liable for the false and defamatory meaning he deliberately conveyed through their selection, editing, arrangement, captioning, and accompanying commentary.

199. Mr. Jennings published portions of Mr. Piker's October 2024 Stream in a manner that concealed the circumstances in which the statements were made. The presentation removed the debate Mr. Piker was criticizing, the words identifying the subject of his ridicule, his laughter, the contemporaneous audience reactions, and his subsequent explanation.

200. Mr. Jennings then added a purported first-person quotation that Mr. Piker never uttered and expressly told his audience that Mr. Piker was calling for Black voters to be lynched.

201. Mr. Jennings also added "@HasanAbi" to the Manipulated Video, representing to his viewers that the content was taken directly from Mr. Piker's Twitch stream when it was not.

202. The resulting publication conveyed the false factual implication that Mr. Piker sincerely supported lynching Black Americans and wanted the practice restored.

203. That implication was not an incidental or unintended consequence of the editing. Mr. Jennings affirmatively endorsed it. He warned Black listeners to pay attention, presented the manipulated footage as proof, attributed to Mr. Piker a supposed plan to restore lynchings, and repeated the accusation across multiple social media platforms.

204. The defamatory implication was false. Mr. Piker was mocking another commentator's views, not endorsing lynching or racial violence.

205. Mr. Jennings intended to convey the defamatory implication, or at minimum knew or recklessly disregarded that the publication would convey it. His own words established that the false implication was the very message he wanted his audience to take from the footage.

206. Mr. Jennings acted with actual malice for the reasons alleged above, including his fabrication of a purported quotation, his adoption of a misleadingly edited video, his accusations unsupported by either the original or edited footage, and his failure to correct the record after receiving direct notice of the falsity.

207. It is furthermore axiomatic that editing a quotation, such as by omitting surrounding context in a manner that materially changes the impression that average viewers would have of what was conveyed by the defendant in comparison to what was actually stated, constitutes actionable defamation by implication.

208. The defamatory implication was of and concerning Mr. Piker, was published to third parties, and was reasonably understood to accuse him of advocating racially motivated murder.

209. The implication is defamatory *per se* because it injures Mr. Piker in his profession and imputes conduct involving moral turpitude, as alleged in Count One.

210. As a direct and proximate result, Mr. Piker has suffered the reputational, professional, economic, and emotional injuries alleged above, including actual pecuniary losses. He seeks presumed and actual damages, or alternatively special damages to the extent required.

211. Further, Mr. Jennings' false and defamatory implications were republished thousands of times, including by Salem News Channel and social media users. These republications were foreseeable to Mr. Jennings because he is familiar with Salem News Channel's broadcast schedule, and aware that his social media posts are routinely republished by

social media users. Mr. Piker seeks damages for these and all other reasonably foreseeable republications.

212. Mr. Jennings' intentional and reckless conduct also warrants punitive damages.

***COUNT THREE — FALSE LIGHT (IN THE ALTERNATIVE)***

213. Mr. Piker incorporates the preceding allegations as though fully set forth here.

214. This claim is pleaded in the alternative to Counts One and Two and arises from the same publications.

215. Through his August 11, 2026, broadcast and subsequent social media publications, Mr. Jennings gave widespread publicity to a false portrayal of Mr. Piker as a violent racist who supported lynching Black Americans.

216. The false portrayal resulted from the Manipulated Video, the fabricated quotation, Mr. Jennings' visual attribution of the Manipulated Video to Mr. Piker's Twitch stream, Mr. Jennings' express accusation that Mr. Piker was "calling for Black voters to be lynched," his reference to a supposed "Piker plan of returning our country to lynchings," and his assertion that Mr. Piker believed the United States should resume lynchings against Black people.

217. The publications placed Mr. Piker before the public in a false light. They attributed to him statements and intentions he did not hold or express.

218. The false light would be highly offensive to a reasonable person. Few accusations are more serious than falsely portraying someone as an advocate of racially motivated murder, particularly where the accusation is made to a nationwide audience and presented as a warning to the very people supposedly threatened.

219. Mr. Jennings knew the portrayal was false or acted with reckless disregard for its falsity. He supplied words Mr. Piker never spoke, relied on footage stripped of its explanatory context, and made accusations unsupported by the underlying material.

220. Mr. Jennings' repeated publications, the deliberate framing of the accusations as warnings to Black voters, and his refusal to correct the record after receiving notice further demonstrate the intentional and reckless nature of his conduct.

221. As a direct and proximate result of the false publicity, Mr. Piker has suffered injury to his reputation, public humiliation, emotional distress, mental anguish, and damage to his professional interests.

222. Mr. Jennings' false and defamatory statements were republished thousands of times, including by Salem News Channel and social media users. These republications were neither unexpected nor incidental. Mr. Jennings knew Salem News Channel's broadcast and distribution practices and understood that his social media posts would be widely shared and amplified. Indeed, given the inflammatory nature of his accusation and Mr. Piker's public prominence, widespread republication was not merely foreseeable; it was the predictable result of Mr. Jennings' decision to broadcast and disseminate the statements. Mr. Piker seeks damages for all reasonably foreseeable republications of Mr. Jennings' defamatory statements, including those by Salem News Channel and third-party social media users.

223. Mr. Jennings' conduct was malicious, willful, and wanton and demonstrated conscious disregard for Mr. Piker's rights. Punitive damages are warranted.

## PRAYER FOR RELIEF

224. WHEREFORE, Plaintiff Hasan Piker requests that judgment be entered in his favor and against Defendant Scott Jennings, awarding:

(a) Compensatory damages in an amount not less than $27,500,000;

(b) Punitive damages in the amount of $45,000,000;

(c) Costs and expenses of this action, including reasonable attorneys' fees to the extent recoverable by law;

(d) Prejudgment and postjudgment interest to the extent permitted by law; and

(e) Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

225. Plaintiff demands trial by jury on all issues so triable.

Dated: November 24, 2026

Respectfully submitted,

**MEIER WATKINS**
**PHILLIPS PUSCH LLP**

Daniel P. Watkins (DC Bar No. 461964)*
B. Gammon Fain (DC Bar No. 90004875)
Devin K. Bolger (DC Bar No. 90031366)*
1120 20th Street NW, Suite 550
Washington, District of Columbia 20036
(202) 318-3655
daniel.watkins@mwpp.com
gammon.fain@mwpp.com
devin.bolger@mwpp.com

* - *pro hac vice* forthcoming

*Counsel for Plaintiff*
HASAN PIKER

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 24, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record who are deemed to have consented to electronic service.

*/s/ B. Gammon Fain*
B. Gammon Fain